## LICENSE AGREEMENT

This Agreement is made and entered into as of the 3 1st day of October, 2003, by and between the UNIVERSITY OF PITTSBURGH – OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, a non-profit corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal office at 4200 Fifth Avenue, Pittsburgh, Pennsylvania 15260 (UNIVERSITY), and TESSERA DIAGNOSTICS, INC., having its principal offices at 119 First Ave. South, Suite 410,, Seattle, WA 98104 (LICENSEE).

WHEREAS, UNIVERSITY is the owner of certain PATENT RIGHTS, as defined below in Section 1.5, entitled "Nuclear Matrix Protein Alterations Associated with Colon Cancer and Colon Metastasis to the Liver, and uses Thereof," United States Patent Application No. 10/350,367 filed January 24, 2003 and PCT/US/03/02340, filed January 27, 2003, developed by Dr. Robert Getzenberg, et al of the UNIVERSITY faculty, and the UNIVERSITY has the right to grant licenses under such PATENT RIGHTS;

WHEREAS, UNIVERSITY desires to have the PATENT RIGHTS utilized in the public interest;

WHEREAS, LICENSEE has represented to UNIVERSITY, to induce UNIVERSITY to enter into this Agreement, that LICENSEE is experienced in the development, production, manufacture, marketing and sale of products and/or the use of similar products to the LICENSED TECHNOLOGY and that LICENSEE shall commit itself to a thorough, vigorous and diligent program of exploiting the PATENT RIGHTS so that public utilization results therefrom; and

WHEREAS, LICENSEE desires to obtain a license under the PATENT RIGHTS in the FIELD upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE 1 – DEFINITIONS

For purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1    AFFILIATE shall mean, with respect to UNIVERSITY, any clinical or research entity in Pittsburgh which is operated or managed as a facility under the UPMC Health System, whether or not owned by UNIVERSITY.

1.2    LICENSEE shall mean Tessera Diagnostics, Inc. and all entities at least fifty percent (50%) owned or controlled by Tessera Diagnostics, Inc.  For purposes of this definition, LICENSEE shall be in "control" of an entity if it owns or controls at least fifty percent (50%) of the equity securities of the subject entity, or if it is entitled to appoint a majority of the directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority).

1.3    DISTRIBUTOR shall mean a company or companies who are granted rights by the LICENSEE to market and sell products or processes included in LICENSED TECHNOLOGY that are manufactured by, or produced for, LICENSEE and sold to the DISTRIBUTOR by LICENSEE.

1.4    SUBLICENSEE shall mean a company or companies which are granted rights by the LICENSEE, in consideration for a royalty of the SUBLICENSEE's revenue, to manufacture, market and sell products or processes that adapt the LICENSED TECHNOLOGY to SUBLICENSEE's automated diagnostic testing systems or other delivery systems(s) for use in the FIELD.

1.5    LICENSED TECHNOLOGY shall mean any product or part thereof or process which is:

Tessera.Colon.Lic.Agt.9.02.03-12

(a)  Covered in whole or in part by an issued, unexpired or pending claim contained in the PATENT RIGHTS in the country in which any such product or part thereof is made, used or sold or in which any such process is used or sold;

(b)  Manufactured by using a process or is employed to practice a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS in the country in which any such process that is included in LICENSED TECHNOLOGY is used or in which such product or part thereof is used or sold.

1.6   LICENSEE's NET SALES shall mean LICENSEE's and DISTRIBUTORS' invoice price for products or processes included in LICENSED TECHNOLOGY sold directly to an enduser or through a DISTRIBUTOR and produced hereunder, less the sum of the following:

(a)  Actual credits, allowances, discounts and rebates to, and chargebacks from the account of, such independent customers for spoiled, damaged, out-dated, rejected or returned products;

(b)  Actual cost of freight and insurance charges or freight absorption, separately stated in such invoice;

(c)  Actual trade, quantity or cash discounts or other price reductions allowed, if any; and

(d)  Sales taxes, tariff duties and/or use taxes separately stated on each invoice.

1.7   SUBLICENSEE's NET SALES shall mean SUBLICENSEE's invoice price for products or processes included in LICENSED TECHNOLOGY sold,  less the sum of the following:

(a)  Actual credits, allowances, discounts and rebates to, and chargebacks from the account of, such independent customers for spoiled, damaged, out-dated, rejected or returned products;

3

(b)     Actual cost of freight and insurance charges or freight absorption, separately stated in such invoice;

(c)     Actual trade, quantity or cash discounts or other price reductions allowed, if any; and

(d)     Sales taxes, tariff duties and/or use taxes separately stated on each invoice.

1.8     PATENT RIGHTS shall mean UNIVERSITY intellectual property described below:

(a)     The United States and foreign patents and/or patent applications listed in Exhibit A;

(b)     United States and foreign patents issued from the applications listed in Exhibit A and from divisionals, continuations and continuations-in-part, reissues, renewals, extensions or additions to any such patents and patent applications;

(c)     Claims of U.S. and foreign continuation-in-part applications, and of the resulting patents, which are directed to subject matter specifically described in the U.S. and foreign applications listed in Exhibit A and described in (b) above; and

(d)     Claims of all foreign patent applications, and of the resulting patents, which are directed to subject matter specifically described in the United States patents and/or patent applications described in (a), (b) or (c) above.

1.9     FIELD shall mean laboratory medical diagnostics and in vivo medical imaging agents.

1.10    OTHER FIELDS shall mean
drug discovery and medical therapeutics.

1.11    RIGHT OF FIRST OFFER shall mean that LICENSEE, after UNIVERSITY has provided written notice to LICENSEE of a third party's interest in a license of PATENT RIGHTS and LICENSED TECHNOLOGY for OTHER FIELD, will have a period of thirty (30)

4

days to make a license proposal to the UNIVERSITY for LICENSED TECHNOLOGY in OTHER FIELD.  UNIVERSITY shall not be obligated to accept such license proposal from LICENSEE for LICENSED TECHNOLOGY for OTHER FIELD and shall accept or reject such license proposal in its sole discretion.

## ARTICLE 2 - GRANT

2.1     UNIVERSITY hereby grants to LICENSEE, to the extent it may lawfully do so, the worldwide exclusive license to make, have made, use and offer for sale, sell and import the LICENSED TECHNOLOGY and to practice under the PATENT RIGHTS in the FIELD to the end of the term for which the PATENT RIGHTS are granted, unless this Agreement is terminated sooner as provided herein.  The license granted hereby is subject to the rights of the United States government, if any, as set forth in 35 U.S.C. Section 200, et seq.

2.2     UNIVERSITY reserves the royalty-free, nonexclusive right to practice under the PATENT RIGHTS and to use the LICENSED TECHNOLOGY for its own noncommercial education and research purposes.

2.3     LICENSEE shall have the right to enter into sublicensing arrangements with SUBLICENSEES for the rights, privileges and licenses granted hereunder upon prior written approval of UNIVERSITY, except that SUBLICENSEES shall not have rights to sublicense. Rights of any SUBLICENSEE shall terminate upon termination of this Agreement.

2.4     UNIVERSITY hereby grants to LICENSEE, to the extent it may lawfully do so, the RIGHT OF FIRST OFFER for a period of two (2) years from date of this Agreement, unless this Agreement is terminated sooner as provided herein.

2.5     LICENSEE agrees that any sublicense granted by it shall provide that the obligations to UNIVERSITY of Articles 2, 7, 8, 9, 10, 11 and 13 of this Agreement shall be binding upon the SUBLICENSEE as if it were party to this Agreement.

Tessera.Colon.Lic.Agt.9.02.03-12

2.6   LICENSEE agrees to forward to UNIVERSITY a copy of any and all sublicense agreements promptly upon execution thereof.

2.7   The license granted hereunder shall not be construed to confer any rights upon LICENSEE by implication, estoppel or otherwise as to any technology not specifically set forth in Exhibit A hereof.

## ARTICLE 3 – DUE DILIGENCE

3.1   LICENSEE shall use its best efforts to bring the LICENSED TECHNOLOGY to market through a thorough, vigorous and diligent program for exploitation of the PATENT RIGHTS and to continue active, diligent marketing efforts for the LICENSED TECHNOLOGY throughout the pendency of this Agreement.

3.2   In addition, LICENSEE shall adhere to each of the following milestones:

(a)   Within twenty-four (24) months from the date of this Agreement, LICENSEE shall have produced a commercial prototype of an immunoassay kit and/or a nucleic acid-based test containing a LICENSED PRODUCT;

(b)   Within thirty-six (36) months from the date of this Agreement, LICENSEE shall have submitted an application for regulatory approval for a product or process included in LICENSED TECHNOLOGY;

(c)   Within forty-eight (48) months from the date of this Agreement, LICENSEE shall have executed an agreement with a DISTRIBUTOR or SUBLICENSEE to market and sell products or processes included in LICENSED TECHNOLOGY.

3.3   LICENSEE's failure to perform in accordance with Section 3.1 or to fulfill on a timely basis any one of the milestones set forth in Section 3.2 hereof shall be

Tessera.Colon.Lic.Agt.9.02.03-12

grounds for UNIVERSITY to terminate this Agreement and upon termination all rights and interest to the LICENSED TECHNOLOGY and PATENT RIGHTS shall revert to UNIVERSITY.

## ARTICLE 4 – ROYALTIES AND OTHER LICENSE CONSIDERATION

4.1    In consideration of the rights, privileges and license granted by UNIVERSITY hereunder, LICENSEE shall pay royalties and other monetary consideration as follows:

(a)    Initial license fee, non-refundable and non-creditable against royalties, in the amount of Twenty-Five Thousand Dollars ($25,000) payable within five (5) days after the date of this Agreement;

(b)    Royalties on LICENSEE's NET SALES of the LICENSED TECHNOLOGY per calendar quarter in an amount equal to six percent (6%) of LICENSEE's NET SALES;

(c)    Royalties on SUBLICENSEE's NET SALES of the LICENSED TECHNOLOGY per calendar quarter in an amount equal to two percent (2%) of SUBLICENSEE's NET SALES.

(d)    Maintenance fees, or beginning in the year of first commercial sale of a product or process incorporating LICENSED TECHNOLOGY, minimum royalties in the amount of:

(i)    Fifty Thousand Dollars ($50,000) payable on the first anniversary of the date of this Agreement;

(ii)    Seventy-Five Thousand Dollars ($75,000) payable on the second anniversary of the date of this Agreement; and

(iii)    One Hundred Twenty-Five Thousand Dollars ($125,000) payable on the third anniversary of the date of this Agreement and on each

7

Tessera.Colon.Lic.Agt.9.02.03-12

subsequent anniversary thereafter for a total of ten (10) years during the term of this Agreement and One Hundred Thousand Dollars ($100,000) , on each subsequent anniversary thereafter for the life of this Agreement.  Beginning in the year in which the first commercial sale of a product or process incorporating LICENSED TECHNOLOGY occurs, such amounts shall be payable as a minimum royalty if such minimum royalty is greater than the sum of the aggregate annual royalties computed in accordance with Sections 4.1(b) and (c) above.

(e)   Milestone payments in the amounts of:

(i)   One Hundred Thousand Dollars ($100,000) in cash by University payable within thirty (30) days following receipt by LICENSEE of FDA approval for any product or process incorporating the LICENSED TECHNOLOGY; and

(ii)   Fifty Thousand Dollars ($50,000) payable within thirty (30) days following execution of the first agreement with a SUBLICENSEE and/or DISTRIBUTOR for any product or process incorporating the LICENSED TECHNOLOGY.

The UNIVERSITY may elect to take some, or all, of the Milestone Payments in the form of equity in LICENSEE wherein the price of said equity in LICENSEE is set by the last major financial round proceeding the achievement of said Milestone.

4.2   Royalty payments, pursuant to Section 4.1 above, shall be paid to UNIVERSITY in United States dollars and directed to the address set forth in Section 12 hereof within thirty (30) days after each March 31, June 30, September 30 and December 31.  The minimum royalty, pursuant to Section 4.1(d) (iii) above, shall be paid to UNIVERSITY in like manner by

8

December 15 of the calendar year in which the minimum royalty is due. Milestone payments to UNIVERSITY shall be made within fifteen (15) days after each milestone is met.

4.3   Following the date of the Agreement, UNIVERSITY shall also receive ten percent (10%) of all lump sum, non-royalty payments (including up-front fees, maintenance fees and/or milestone payments) received by LICENSEE as part of any sublicense for the LICENSED TECHNOLOGY. Payments subject to the lump sum split shall not include: (i) payments for the purchase of equity in LICENSEE; (ii) payments for research or development, including payment for clinical studies and regulatory approvals performed by or for the LICENSEE; or (iii) payments for reimbursement of patent expenses. Payments pursuant to this Section 4.3 shall be made to UNIVERSITY within thirty (30) days after receipt thereof by LICENSEE from any SUBLICENSEE.

4.4   Payments pursuant to this Agreement which are overdue shall bear interest calculated from the due date until payment is received at the rate of eight percent (8%) per annum.

4.5   LICENSEE shall sell products and/or processes resulting from LICENSED TECHNOLOGY to UNIVERSITY and its AFFILIATES upon request at such price(s) and on such terms and conditions as such products and/or processes are made available to LICENSEE's most favored customer.

**ARTICLE 5 – REPORTS**

5.1   Beginning with the first sale of a LICENSED TECHNOLOGY, within thirty (30) days after each March 31, June 30, September 30 and December 31 of each year during the term of this Agreement, LICENSEE shall make written reports of the following information:

(a)   Number of LICENSED TECHNOLOGY products or processes manufactured and sold by LICENSEE and all SUBLICENSEES and DISTRIBUTORS;

Tessera.Colon.Lic.Agt.9.02.03-12

(b)     Net Sales for all such products or processes;

(c)     Accounting for all LICENSED TECHNOLOGY products or processes used or sold by LICENSEE and all DISTRIBUTORS and SUBLICENSEES;

(d)     Total royalties due; and

(e)     Names and addresses of SUBLICENSEES.

5.2     If no royalties shall be due hereunder, LICENSEE shall so advise UNIVERSITY in writing within thirty (30) days after the end of any calendar quarter for which no royalties are due.

5.3     For a period of at least six (6) years, LICENSEE shall keep full, true and accurate books of account, in accordance with generally accepted accounting principles, containing all information that may be necessary for the purpose of showing the amounts payable to UNIVERSITY hereunder.  Such books of account shall be kept at LICENSEE's principal place of business.  UNIVERSITY shall be have the right, not more frequently than four times during any twelve (12) month period during the term of this Agreement, through a mutually acceptable independent certified accountant, upon at least thirty (30) days' prior written notice, to inspect such records during normal business hours to verify that LICENSEE has paid the correct amount of royalties hereunder.  The fees and expenses of UNIVERSITY's representatives shall be borne by UNIVERSITY; however, if an error of more than five percent (5%) of the total payments due or owing for any year is discovered, then LICENSEE shall bear the fees and expenses of UNIVERSITY's representatives.

**ARTICLE 6 – PATENT PROSECUTION**

6.1     UNIVERSITY has or shall apply for, seek prompt issuance of and maintain during the term of this Agreement the PATENT RIGHTS in the United States and in such foreign countries as may be designated by LICENSEE in a written notice to UNIVERSITY within a reasonable time in advance of the required foreign filing dates.  LICENSEE shall have

10

the opportunity to advise and cooperate with UNIVERSITY in the prosecution, filing and maintenance of such patents.

6.2     All fees and costs, including attorneys' fees, relating to the filing, prosecution and maintenance of the PATENT RIGHTS incurred after the date of this Agreement shall be the responsibility of LICENSEE.  Fees and costs incurred after the date of this Agreement shall be paid by LICENSEE within thirty (30) days after receipt of UNIVERSITY's invoice therefor. Payments pursuant to this Section 6.2 are not creditable against royalties.

6.3     All fees and costs, including attorneys' fees, relating to the filing, prosecution and maintenance of the PATENT RIGHTS incurred prior to the date of this Agreement shall be the responsibility of LICENSEE.  Such fees and costs incurred by UNIVERSITY prior to the date hereof total $34,867.72 and will be payable by LICENSEE to UNIVERSITY at the rate of $5000 per month for six months with the balance of $2,867.72 payable in the seventh month; the first payment shall be made within 30 days after the date of this Agreement.  Payments pursuant to this Section 6.3 are not creditable against royalties.

**ARTICLE 7 – INFRINGEMENT ACTIONS**

7.1     LICENSEE shall inform UNIVERSITY promptly in writing of any alleged infringement of the PATENT RIGHTS by a third party and of any available evidence thereof.

7.2     During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense all infringements of the PATENT RIGHTS if LICENSEE has notified UNIVERSITY in writing of its intent to prosecute; provided, however, that such right to bring such an infringement action shall remain in effect only for so long as the license granted herein remains exclusive.  In furtherance of such right, UNIVERSITY hereby agrees that LICENSEE may include UNIVERSITY as a party plaintiff in any such suit, without expense to UNIVERSITY.  The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE and, after deducting the costs of the infringement action (including attorney's fees), UNIVERSITY shall receive a percentage of

11

any recovery or damages for past infringement derived therefrom which is equal to the percentage royalty due UNIVERSITY under Article 4. LICENSEE shall indemnify UNIVERSITY against any order for costs that may be made against UNIVERSITY in such proceedings.

7.3    If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify UNIVERSITY at any time prior thereto of its intention not to bring suit against any alleged infringer, then, and in those events only, UNIVERSITY shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the PATENT RIGHTS, and UNIVERSITY may, for such purposes, use the name of LICENSEE as party plaintiff. UNIVERSITY shall bear all costs and expenses of any such suit. In any settlement or other conclusion, by litigation or otherwise, UNIVERSITY shall keep any recovery or damages for past infringement derived therefrom.

7.4    In the event that a declaratory judgment action alleging invalidity or infringement of any of the PATENT RIGHTS shall be brought against UNIVERSITY, LICENSEE, at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

7.5    In any infringement suit either party may institute to enforce the PATENT RIGHTS pursuant to this Agreement, the other party shall, at the request and expense of the party initiating such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

## ARTICLE 8 – INDEMNIFICATION/INSURANCE/LIMITATION OF LIABILITY

8.1    LICENSEE shall at all times during the term of this Agreement and thereafter indemnify, defend and hold UNIVERSITY, its trustees, officers, employees and affiliates

12

harmless against all third party claims and expenses, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property or the environment, and against any other claim, proceeding, demand, expense and liability of any kind whatsoever resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the LICENSED TECHNOLOGY or arising from any obligation of LICENSEE hereunder.

8.2     LICENSEE shall obtain and carry in full force and effect liability insurance which shall protect LICENSEE and UNIVERSITY in regard to events covered by Section 8.1 above, as provided below:

| COVERAGE | LIMITS |
|---|---|
| a. Commercial General Liability, including, but not limited to, Products, Contractual, Fire, Legal and Personal Injury | $1,000,000  Combined Single Limits for Bodily Injury and Property Damage |
| b. Umbrella Liability | $5,000,000 |

The University of Pittsburgh is to be named as an additional insured with respect to insurance policies identified in Sections 8.2(c) and 8.2(d) above.

Certificates of insurance evidencing the coverage required above shall be filed with the University's Office of Risk Management, 1817 Cathedral of Learning, Pittsburgh, PA 15260, no later than fifteen (15) days after execution of this Agreement and annually thereafter.  Such certificates shall provide that the insurer will give the University not less than thirty (30) days advance written notice of any material changes in or cancellation of coverage.

8.3     EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, UNIVERSITY MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS A REPRESENTATION OR WARRANTY GIVEN BY UNIVERSITY THAT THE PRACTICE BY LICENSEE OF

13

THE LICENSE GRANTED HEREUNDER SHALL NOT INFRINGE THE PATENT RIGHTS OF ANY THIRD PARTY.

## ARTICLE 9 – ASSIGNMENT

9.1    Except as otherwise expressly provided under this Agreement, neither this Agreement nor any right or obligation hereunder may be assigned or otherwise transferred (whether voluntarily, by operation of law or otherwise), without the prior express written consent of the other party; provided, however, that either party may, without such consent, assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger, consolidation, change in control or similar transaction.  Any permitted assignee shall assume all obligations of its assignor under this Agreement.  Any purported assignment or transfer in violation of this Article 9 shall be void.

## ARTICLE 10 – TERMINATION

10.1    UNIVERSITY shall have the right to terminate this Agreement if:

    (a)    LICENSEE shall default in the performance of any of the obligations herein contained and such default has not been cured within thirty (30) days after receiving written notice thereof from UNIVERSITY; or

    (b)    LICENSEE shall cease to carry out its business, become bankrupt or insolvent, apply for or consent to the appointment of a trustee, receiver or liquidator of its assets or seek relief under any law for the aid of debtors.

10.2    LICENSEE may terminate this Agreement for any reason or no reason upon ninety (90) days prior written notice to UNIVERSITY and upon payment of all amounts due UNIVERSITY through the effective date of termination.

Tessera.Colon.Lic.Agt.9.02.03-12

10.3    Upon termination of this Agreement, neither party shall be released from any obligation that matured prior to the effective date of such termination.  LICENSEE and any SUBLICENSEE may, however, after the effective date of such termination, sell all products under the LICENSED TECHNOLOGY which LICENSEE produced prior to the effective date of such termination, provided that LICENSEE shall pay to UNIVERSITY the royalties thereon as required by Article 4 hereof and submit the reports required by Article 5 hereof.  Furthermore, University shall have the right to have and use preclinical, clinical and regulatory data and studies developed and submitted to any regulatory agency by LICENSEE for products under the LICENSED TECHNOLOGY.   Such data and studies shall be made available by the LICENSEES within 30 days of written request to by the UNIVERSITY.

## ARTICLE 11 – NOTICES

11.1    Any notice or communication pursuant to this Agreement shall be sufficiently made or given if sent by certified or registered mail, postage prepaid, or by overnight courier, with proof of delivery by receipt, addressed to the address below or as either party shall designate by written notice to the other party.

In the case of UNIVERSITY:

> Director
> Office of Technology Management
> University of Pittsburgh
> 200 Gardner Steel Conference Center
> Thackeray & O'Hara Streets
> Pittsburgh, PA  15260

In the case of LICENSEE:

> CEO
> Tessera Diagnostics, Inc.
> 119 First Ave. South
> Suite 410
> Seattle, WA  98104

Tessera.Colon.Lic.Agt.9.02.03-12

## ARTICLE 12 – AMENDMENT, MODIFICATION

12.1    This Agreement may not be amended or modified except by the execution of a written instrument signed by the parties hereto.

## ARTICLE 13 – MISCELLANEOUS

13.1    This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania.  Except for arbitrations, as set forth in Article 10, the forum for any action relating to this Agreement shall be the Courts of Allegheny County, Pennsylvania, or, if in a federal proceeding, the United States District Court for the Western District of Pennsylvania.

13.2    The parties acknowledge that this Agreement sets forth the entire understanding and intentions of the parties hereto as to the subject matter hereof and supersedes all previous understandings between the parties, written or oral, regarding such subject matter.

13.3    Nothing contained in this Agreement shall be construed as conferring upon either party any right to use in advertising, publicity or other promotional activities any name, trade name, trademark, or other designation of the other party, including any contraction, abbreviation, or simulation of any of the foregoing.  Without the express written approval of the other party, neither party shall use any designation of the other party in any promotional activity associated with this Agreement or the LICENSED TECHNOLOGY.  Neither party shall issue any press release or make any public statement in regard to this Agreement without the prior written approval of the other party.

13.4    If one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable, the remaining provisions shall not in any way be affected or impaired thereby.  In the event any provision is held illegal or unenforceable, the parties shall use reasonable efforts to

16

substitute a valid, legal and enforceable provision which, insofar as is practical, implements purposes of the provision held invalid, illegal or unenforceable.

13.5    Failure at any time to require performance of any of the provisions herein shall not waive or diminish a party's right thereafter to demand compliance therewith or with any other provision.  Waiver of any default shall not waive any other default.  A party shall not be deemed to have waived any rights hereunder unless such waiver is in writing and signed by a duly authorized officer of the party making such waiver.

13.6    LICENSEE acknowledges that UNIVERSITY is free to publish the results of the research activities of its faculty, staff and students, even though such publication may involve the PATENT RIGHTS or LICENSED TECHNOLOGY.   UNIVERSITY agrees to submit to LICENSEE any proposed publication or presentation regarding the subject matter specifically described in the PATENT RIGHTS for prior review by LICENSEE at least sixty (60) days before its submittal for publication or its presentation.  LICENSEE may, within thirty (30) days after receipt of such proposed publication, request that such proposed publication be delayed not more than ninety (90) days in order to allow for protection of intellectual property rights.

IN WITNESS WHEREOF, the parties have set their hands and seals as of the date set forth on the first page hereof.

UNIVERSITY OF PITTSBURGH – OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION

By _____
Jerome Cochran
Executive Vice Chancellor

TESSERA DIAGNOSTICS, INC.

By _____

17

Tessera.Colon.Lic.Agt.9.02.03-12

Chief Executive Officer

Tessera.Colon.Lic.Agt.9.02.03-12

**Exhibit A**

**LICENSE AGREEMENT**
**BETWEEN**
**UNIVERSITY OF PITTSBURGH**
**AND**
**TESSERA, INC.**

University Reference No. 588

"Nuclear Matrix Protein Alterations Associated with Colon Cancer and Colon Metastasis to the Liver, and uses Thereof," United States Patent Application No. 10/350,367 filed January 24, 2003.

"Nuclear Matrix Protein Alterations Associated with Colon Cancer and Colon Metastasis to the Liver, and uses Thereof," PCT Application No. PCT/US/03/02340, filed January 27, 2003, developed by Dr. Robert Getzenberg, et al

19