IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ONCONOME, INC.,

               Plaintiffs,                           09cv1195

                                                  **ELECTRONICALLY FILED**

   v.

UNIVERSITY OF PITTSBURGH, DR.
ROBERT GETZENBERG,

               Defendants.

**MEMORANDUM OPINION RE: DEFENDANTS' MOTION TO
DISMISS  SECOND AMENDED COMPLAINT  (DOC. NO. 31)**

**I.      Introduction**

     No matter how plaintiff dresses up its claims, this case is fundamentally a breach of

contract action; the various trespass claims set forth in Onconome, Inc.'s Second Amended

Complaint are thinly disguised breach of contract claims, untimely ones at that.  The Court will,

therefore, grant defendants' Motion to Dismiss Second Amended Complaint or in the

Alternative, Motion for Summary Judgment ("Motion to Dismiss or for Summary Judgment")

(Doc. No. 31), for the reasons stated below.

**II.      Facts Alleged in Second Amended Complaint**

**A.      Background Facts**

     Plaintiff Onconome, Inc. ("Onconome"), a privately owned biotechnology corporation

incorporated under the laws of the State of Washington with its principal place of business in

Redmond, Washington, filed this action against Defendants University of Pittsburgh ("Pitt") and

Robert H. Getzenberg ("Dr. Getzenberg"), on the basis of diversity jurisdiction under 28 U.S.C.

§ 1332.  The Second Amended Complaint states "an action for scientific research fraud and

breach of contract" against Pitt and its principal investigator, Dr. Getzenberg, who "claimed to have developed superior biomarkers for prostate cancer, Early Prostate Cancer Antigen ("EPCA") and EPCA-2, and for other cancers."  Second Amended Complaint,  ¶¶ 1, 3.

Onconome, Inc., formerly known as Tessera Diagnostics, Inc., was founded in 2001 by H. Raymond Cairncross, Esquire, founder and managing partner at Cairncross & Hempelmann in Seattle, Washington, where he specialized in corporate and business law and corporate finance. Declaration of Ray Cairncross in Opposition to Motion to Dismiss Of University of Pittsburgh and Dr. Robert Getzenberg (Doc. No. 22) ("Declaration of Ray Cairncross"), ¶ 1.  Mr. Cairncross had "experience with early stage biotechnology companies as a businessman and lawyer, but not as a scientist." *Id.*, ¶ 2.  Nevertheless, Mr. Cairncross co-founded Ostex International, a start-up biotech company, in 1989, serving as its Chairman and CEO until 1997, and in1994, co-founded, became a director of and arranged Series A financing for Omeros Corporation, a pharmaceutical company which recently completed its initial public offering, managed by Deutsche Bank Securities.  *Id.*  Mr. Cairncross also negotiated Corporate Research Agreements ("CRAs") with both Pitt and Johns Hopkins University ("JHU"), as well as Licensing Agreements ("LAs") with those institutions, managed Onconome's financings, and established and executed the business and development strategies employed by Onconome from its inception.  *Id.*, ¶ 3.

At Mr. Cairncross' direction, Onconome became an operating concern in 2002, seeking to market and sell immunoassays based on certain prostate cancer biomarkers represented as having been discovered by Dr. Getzenberg.  Second Amended Complaint, ¶ 33.  Onconome holds itself out to the public and prospective investors as a "company focusing on the discovery, development and commercialization of innovative biomarkers for the early and accurate

detection of various forms of cancer . . ."  See www.onconome.com.   Onconome states that it

"intended to manufacture and sell a superior clinical test for prostate cancer" based on

"statements and assurances" by Dr. Getzenberg, who "held a series of prominent research chairs

at several of the most prominent medical research universities" in the United States.  Second

Amended Complaint, ¶ 4.  According to plaintiff,  Dr. Getzenberg represented that he had

"discovered a superior biomarker and  immunoassay for prostate cancer based on nuclear matrix

proteins," in reliance on which Onconome "funded his research for over five years, spending

millions of dollars and devoting virtually its entire anti-cancer effort to the Getzenberg

technology."  *Id*.

In the Declaration of Ray Cairncross, Mr. Cairncross summarizes the relationship

between Onconome, Pitt and Dr. Getzenberg as follows:

> 4. Onconome built its business around Dr. Getzenberg's representations
> that he had discovered Nuclear Matrix Protein ("NMP") biomarkers for prostate
> and other cancers and was developing cancer immunoassays utilizing them, and
> became operational in 2002. From the beginning, Onconome relied on Dr.
> Getzenberg as its chief scientific developer for these technologies, as described
> below.

> 5. Before Onconome could become operational, it needed to raise equity
> capital. Its ability to do so related directly to the attractiveness to investors of both
> the potential of the licensed technology and the efficiency of the business model
> selected by Onconome to pursue the cancer diagnostic opportunity. As an
> outgrowth of its discussions with Dr. Getzenberg, Onconome adopted an efficient
> "virtual" business model under the terms of which Onconome would initially
> maintain a staff comprised principally of people experienced in the formation,
> management, financing and growth of a biotechnology enterprise but not people
> with backgrounds in research, discovery or technology development. Instead,
> Onconome would secure the research expertise of Pitt and Dr. Getzenberg, who
> would perform these functions.  Onconome would fund this research, discovery
> and immunoassay development work through annual Corporate Research
> Agreements with Dr. Getzenberg and his research institutions, first Pitt and later
> JHU. Pitt and Dr. Getzenberg (and later JHU) committed that Dr. Getzenberg

3

would "oversee and coordinate the entire project," including the responsibilities to "oversee the protein isolation, antibody production and characterization as well as immunoassay development," "supervise sample collection and processing," and "conduct all data analysis and interpretation."

6. The business model described above was attractive to Onconome's investors and management due in no small measure to the fact that it had been used successfully at Ostex. The underlying principal was that Onconome would be delegating the scientific research and development work to the researcher credited with discovering the technology, in this case Dr. Getzenberg, and to the prominent institutions with which he was associated.

Declaration of Ray Cairncross, ¶¶ 4-6.

During this period, Onconome asserts in its Second Amended Complaint, Dr. Getzenberg repeatedly made false claims and misrepresentations regarding "'amazing' results for his immunoassays for prostate and other cancers, [which] showed the assays were working consistently, reproducible and demonstrated 'sensitivities' (meaning few false negatives) and 'specificities' (few false positives) approaching 100 percent." Second Amended Complaint, ¶ 5. Plaintiff claims that Dr. Getzenberg embarked upon and maintained a consistent and calculated course of deception to hook and then string Onconome along in order to secure additional backing and funding, even though Dr. Getzenberg knew his "assay was no more accurate in distinguishing cancerous tissue from normal tissue than flipping a coin." Second Amended Complaint, ¶¶ 5-6. "Despite the many historical assertions to the contrary, the Getzenberg laboratory now admits that their immunoassay worked just once in late 2005, for one run, for one researcher alone, and never worked before or since for either this researcher or anyone else." Second Amended Complaint, ¶ 7.

The Second Amended Complaint further alleges that, at all times relevant to the allegations contained therein, "to about January 1, 2005 (or about September 14, 2005, the exact

4

date on which Dr. Getzenberg's agency ended being uncertain), Dr. Getzenberg was employed by and [was] an agent of Pitt, and in all actions alleged herein acted within the scope of that employment and agency.  Dr. Getzenberg was the Director of Urological Research of the Department of Urology, a Co-Director of the Prostate and Urologic Cancer Center of the Pitt Cancer Institute, and a Professor of Urology, Pathology, and Pharmacology at the Pitt School of Medicine.  Dr. Getzenberg was the lead investigator for Pitt in conducting the fraudulent research services that were rendered by Pitt to Onconome as alleged in this Complaint."  Second Amended Complaint, ¶ 14.

Onconome's Second Amended Complaint contains 260 numbered paragraphs organized as follows:

> Section (A) outlines the problem and the need for better prostate cancer diagnostic tool. Section (B) sets forth facts concerning immunoassay and biomarker development. Section (C) sets forth facts addressing the use of nuclear matrix proteins as prostate cancer biomarkers. Section (D) sets forth, in an overview fashion, the relationship between Onconome and Dr. Getzenberg. Section (E) sets forth the specific misrepresentations made by Dr. Getzenberg, organized by date. Section (F) sets forth additional evidence of falsity. Sections (G)-(J) summarize the four core categories of misrepresentations. Section (K) alleges Onconome's contracts with defendants. Section (L) sets forth specific facts germane to Onconome's reasonable reliance and damage.  Section (M) sets forth additional facts establishing defendants' fiduciary duty, and establishing the timeline of Onconome's filing suit. Section (N) sets forth the recent testimony of Dr. Eddy Leman, chief researcher in the Getzenberg laboratory, admitting, inter alia, that the true data showed the assays, in fact, did not work.

Second Amended Complaint, ¶ 15 (summarizing the organization of the Statement of the Facts at ¶¶ 16-260).

For purposes of deciding the Motion to Dismiss or for Summary Judgment, the critical averments of the Second Amended Complaint are contained in Sections D and K, regarding the

relationship between Onconome and Dr. Getzenberg and Onconome's tri-parte contractual

relationship with Dr. Getzenberg and Pitt, and Section M,[1] which attempts to bolster

Onconome's claim that defendants had a fiduciary duty to Onconome, and sets forth the timeline

of defendants' alleged misconduct and Onconome's initiation of this lawsuit.

**B.      Section D - The Confidential Relationship Between Onconome and Dr. Getzenberg**

In Section D, Second Amended Complaint, ¶¶ 31-38, plaintiff asserts that it "placed its

trust, confidence and reliance on defendants for the research and development of the NMP

biomarker immunoassays concerned in this complaint, and defendants possessed a corresponding

opportunity to abuse that trust for their own gain."  Second Amended Complaint, ¶ 31.

Onconome submits that a "confidential and fiduciary relationship existed between Onconome

and Pitt and Dr. Getzenberg" in that defendants "solicited Onconome to trust them in matters in

which they represented themselves as experts, whereas Onconome was not an expert and

accepted the offer and reposed trust in defendants," that defendants had an "overmastering

influence on Onconome and occupied a position of advisor or counselor to reasonably inspire

confidence that defendants would act in good faith for the interest of Onconome in the research

and development of immunoassays," and that "Onconome had weakness, dependence and trust

on defendants in regard to these matters."  *Id.*

Onconome further alleges that "Pitt and Onconome agreed in the Corporate Research

Agreement that Dr. Getzenberg, as Pitt's agent, would oversee and coordinate the entire

[development] project," and that Dr. Getzenberg would "oversee the protein isolation,

---

[1]  "M" is a new section that was added to the Second Amended Complaint.

antibody production, and characterization as well as immunoassay development" thereunder. Second Amended Complaint, ¶ 32. Dr. Getzenberg also was to "supervise sample collection and processing" and "conduct all data analysis and interpretation" because Onconome did not have "the scientific expertise to perform these functions" as defendants were aware. *Id*. Onconome's staff was "comprised principally of people experienced in the formation, management, financing, and growth of a biotechnology enterprise, but not (initially) people experienced in the discovery or technology development side of biotechnology." *Id*. The relationship between plaintiff and defendants required Onconome to "fund all research and immunoassay development work through annual Corporate Research Agreements ("CRA") with defendants." *Id*.

Specifically, Onconome alleges that beginning in 2002, it "entered into a series of . . . CRAs and License Agreements ('LAs'), with Pitt and later Johns Hopkins University ('JHU')", where Dr. Getzenberg was the principal investigator for both universities. Second Amended Complaint, ¶ 34. Under the first CRA dated March 22, 2002, Second Amended Complaint, Exhibit A (Doc. No. 30-2), Dr. Getzenberg agreed and was obligated to "oversee the protein isolation, antibody production and characterization as well as immunoassay development. Similarly, he will supervise sample collection and processing." *Id*. Dr. Getzenberg assumed similar performance obligations in subsequent CRAs.

In return for funding the Pitt and JHU laboratories relating to nuclear matrix proteins as prostate cancer biomarkers, and paying to prosecute related patent applications, Onconome acquired the exclusive right under the CRAs to market any biomarkers in commercial applications. Second Amended Complaint, ¶ 35. From the outset, the plan was to develop a commercial test kit for the new cancer biomarkers that would replace current PSA screening

tests.  *Id*.  Onconome also was to pay all  maintenance fees, minimum royalties and other

payments based on future sales to the licensing institutions, Pitt and JHU.  *Id*.   Under the "terms

of CRAs, Onconome was obligated to and did pay all direct and indirect costs associated with the

research and development work to be done at Dr. Getzenberg's laboratories, at Pitt and later at

JHU, including funds for at least three full-time laboratory personnel plus paying a portion of Dr.

Getzenberg's salary, along with allowances for outside collaborators."  *Id*., ¶ 36.

Onconome claims that between 2002 and the end of 2008, it spent millions of dollars

in fulfilling its commitments under these agreements, and millions more "ramping up its capacity

to make and market the biomarkers . . . ."  *Id*., ¶ 37.  During that time period, Dr. Getzenberg was

the "chief scientific developer and spokesperson for Onconome and its licensed technology, with

all third parties including actual and potential investors."  *Id*., ¶ 38.  In that capacity, Dr.

Getzenberg attended almost every Onconome Board meeting, wherein he would present written

"Research Updates" and make oral presentations which "routinely presented empirical and

factual data reflecting his lab research results, e.g., the specificity and sensitivity of the

immunoassays his lab developed, and which Onconome paid for."  *Id*.

**C.      Section K - Onconome's Contractual Relationship With Defendants**

Pitt and Onconome entered into their initial CRA on or about March 22, 2002.  See

Second Amended Complaint, Exhibits A-C (Doc. No. 30-2 to 30-4) (Initial CRA and

amendments thereto);  Second Amended Complaint, ¶ 211.  Under the CRA, Pitt was obligated

to "use its best efforts to perform research services to [Onconome] in accordance with

[Onconome's] Statement of Work."  *Id*., ¶ 212.  The CRA also required Pitt to provide

Onconome with periodic progress reports, and to meet with its representatives to discuss research

results and Dr. Getzenberg's final written report, when requested or as required by the CRA's Statement of Work. Further, the Pitt CRA required it to give Onconome "on a quarterly basis photocopies of laboratory notebooks from the preceding quarter." In addition, the April 1, 2004 amendment to the Pitt CRA required that "research data shall be shared on a monthly basis, or more frequently if appropriate." *Id.*, ¶ 213. Plaintiff alleges that the Pitt CRA included an implied covenant of good faith and fair dealing, which required that Pitt, inter alia, employ honest research protocols and report research results honestly, diligently and accurately. *Id.*, at 214.

JHU and Onconome entered into a CRA dated January 1, 2005, and Onconome also entered into LAs with Pitt dated February 20, 2002 and October 31, 2003, and an LA with JHU, dated January 22, 2002. *Id.*, ¶¶ 214-15 and Exhibits D and E (Doc. No. 30-5 and 30-6).

Interestingly, although not specifically alleged in their Second Amended Complaint, Mr. Cairncross declared that Onconome also "entered into a Consulting Agreement with Dr. Getzenberg, as approved by both Pitt and later JHU." Declaration of Ray Cairncross, at ¶ 8, and Exhibit A thereto. This Consulting Agreement, like the CRAs and LAs, contained a full integration clause.

Pursuant to the CRAs and Dr. Getzenberg's Consulting Agreement, Dr. Getzenberg was paid fees and costs to attend Board and Shareholder meetings and meetings with various third parties, received generous stock options, acted as the chief scientific spokesperson for Onconome, emphasizing the impressive performance of both the prostate and the colon cancer serum tests and the dramatic impact they would have on diagnostic and prognostic clinical practices, saving lives through early cancer detection and cost savings resulting from efficiencies in the delivery of healthcare, routinely presenting data resulting from work in his lab that was

9

sponsored by Onconome, and he attended in person and presented at nineteen meetings of the

Onconome Board of Directors and every annual shareholders meeting through 2007 and made

dozens of presentations to third parties on behalf of the company.  Declaration of Ray Cairncross,

¶ 8.

     **D.**    **Alleged Misconduct**

Onconome asserts that it relied upon "multiple misrepresentations of material facts" by

Pitt and Dr. Getzenberg by which it was induced to enter into the CRAs and License Agreements

identified above, provide start-up and continuing funding directly to defendants, and incurred

other expenses and damages, including spending "significant sums prosecuting patent

applications for the defendants' benefit . . . [and] supporting defendants' research work."

Second Amended Complaint, ¶ 216.  The Court expresses no opinion about the merits or

plausibility of any of the claims of alleged misrepresentations, and assumes, for purposes of

resolving the Motion to Dismiss or for Summary Judgment only, that defendants did make such

misrepresentations.  The specific content of each alleged misrepresentation is not material to the

matters raised in the Motion to Dismiss or for Summary Judgment.

Onconome claims that Pitt and Dr. Getzenberg benefitted directly and substantially from

Dr. Getzenberg's misrepresentations, fraud, and bad faith dealings, and that it suffered direct

out-of-pocket losses in excess of $13 million as a result of defendants' alleged misconduct, as

well as consequential damages.  *Id*., ¶¶ 216-17.

     **E.**    **Section M - Additional Allegations Regarding Defendants' Fiduciary Duty**
                  **And Tolling Of The Statute Of Limitations**

At the outset, the Court observes that section M of the Second Amended Complaint is a

new section which adds allegations (1) to bolster Onconome's contention that defendants owed it a fiduciary duty, and (2) embellishing the timeline of events and Dr. Getzenberg's alleged misconduct as impacting the statute of limitations.  However, Section M is repetitious of previously averred facts and much of the "new material" consists of inference and argument rather than averments of fact.  In summary, section M sets forth the following.

Onconome relied on Dr. Getzenberg as its "chief scientific developer" for technologies regarding the Nuclear Matrix Protein ("NMP") biomarkers for prostate and other cancers and the cancer immunoassays utilizing them.  Onconome claims that starting in 2002, it built its entire operational business model around Dr. Getzenberg, who would perform the research, discovery and technology development functions, while it provided funding "through annual Corporate Research Agreements with Dr. Getzenberg and his research institutions, first Pitt and later JHU.  Pitt and Dr. Getzenberg (and later JHU) committed that Dr. Getzenberg would 'oversee and coordinate the entire project,' including the responsibilities to 'oversee the protein isolation, antibody production and characterization as well as immunoassay development,' 'supervise sample collection and processing,' and 'conduct all data analysis and interpretation.'"  Second Amended Complaint, ¶ 221.

Onconome relied on this business model, featuring Dr. Getzenberg's scientific and technological acumen, to attract and secure investors.  In order to provide Onconome's management, directors, shareholders and prospective investors with "regular scientific updates, Onconome also entered into a Consulting Agreement with Dr. Getzenberg, as approved by both Pitt and later JHU," wherein Dr. Getzenberg would be paid fees and costs to, inter alia, attend Board and Shareholder meetings and meetings with various third parties to present regular

11

updates on the project and to act as the "chief scientific spokesperson for Onconome."  *Id.*, ¶¶ 222-24.

The lengthy remainder of Section M sets forth, in fairly excruciating detail, a series of events intended to show that Onconome could not reasonably have known about Dr. Getzenberg's misrepresentations or the fraudulent nature of his exaggerated claims until late 2007 - early 2008, despite Onconome's due diligence, and that defendants concealed their fraud from Onconome until that time.  See Second Amended Complaint, ¶¶ 225-235.  The Court will not recite these events and assertions at this time, but will do so as necessary when discussing defendants' argument that all of Onconome's claims are barred by the applicable statutes of limitations.

### F.    Claims for Relief

Based on the foregoing averments, plaintiff sets forth five Claims for Relief: first, common law fraud against all defendants; second, common law fraudulent inducement against all defendants; third, common law breach of fiduciary and confidential relationship against all defendants; fourth, common law failure to supervise against Pitt; and fifth, common law breach of contract against Pitt.  Onconome seeks judgment against both defendants for direct and consequential damages, for prejudgment interest, for punitive and exemplary damages, restitution and disgorgement of unjust enrichment, for costs of suit including attorney's fees, and for such other and further relief as the Court deems just and proper.

### III.    Summary Judgment Standards

Inasmuch as the defendants filed a Motion to Dismiss Second Amended Complaint, or in the Alternative, Motion for Summary Judgment (Doc. No. 31), the Court need not "convert" the

motion to one for summary judgment under Fed.R.Civ.P. 12(d), which provides that if "on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Both parties have submitted numerous documents outside the pleadings which the Court has considered, and accordingly, defendants' motion shall be adjudicated according to the Fed.R.Civ.P. 56 summary judgment standards.[2]

Defendants' Motion to Dismiss Second Amended Complaint or for Summary Judgment sets forth the following grounds for dismissal: (1) all of Onconome's tort claims (First through Fourth Claims for Relief) are barred by the gist of the action doctrine; (2) under the parol evidence rule, Onconome's fraud in the inducement claim (Second Claim for Relief) is further barred by the integration clauses of various contracts; (3) Onconome's claim for breach of a confidential or fiduciary duty (Third Claim for Relief) fails to state a claim upon which relief can be granted; (4) all of Onconome's tort claims are time barred; (5) personal jurisdiction over Dr. Getzenberg is lacking for claims arising from conduct occurring after 2004; (6) Onconome's fraud allegations are conclusory and fail to state a viable claim under state and federal law; and (7) Onconome failed to state a claim for breach of contract against Pitt.

_____

[2] Plaintiff does not and cannot assert that it did not have adequate notice under Rule 12(d) ("[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion") to respond to defendants' motion in the alternative seeking summary judgment. Plaintiff supported its Brief in Opposition (Doc. No. 20) to the initial Motion to Dismiss Amended Complaint, or in the Alternative, Motion for Summary Judgment with numerous exhibits attached to the Declaration of Ray Cairncross. Although plaintiff argues that it needs additional discovery to adequately respond to defendants' dispositive motion, the Court finds that the matter is ripe for summary judgment disposition, because the Court relies only on contracts/ agreements that have been attached to the pleadings, and on averments set forth in plaintiff's Second Amended Complaint and in the Declaration of Ray Cairncross, which the Court assumes to be true for purposes of deciding the Motion to Dismiss and for Summary Judgment.

Fed.R.Civ.P. 56(c)(2) provides that, on a motion for summary judgment, the "judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56 of the Federal Rules of Civil Procedure 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. Sch. Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), quoting *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted).  An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."), citing *Anderson* and *Celotex Corp.* Recently, the United States Supreme Court  "emphasized, [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not

14

lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372 (2007) (internal quotations omitted), quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001); *Woodside*, 248 F.3d at 130; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999). Further, a court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998), quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

After careful consideration of the Second Amended Complaint, the Motion to Dismiss the Second Amended Complaint or for Summary Judgment and briefs in support, and plaintiff's response and brief in opposition thereto, the Court finds there are no genuine issues of material fact as to defendants' first (gist of the action is breach of contract) and fourth (statute of limitations has expired on the trespass claims) grounds, and therefore will enter summary judgment in favor of defendants on all of the trespass claims (Claims One through Four). However, inasmuch as the gist of plaintiff's complaint is for breach of contract, the Court finds that plaintiff has offered sufficient material facts to survive the motion for summary judgment on its claim for breach of contract at this time, and will deny the Motion to Dismiss or for Summary Judgment on defendants' seventh ground as to plaintiff's fifth Claim for breach of contract.[3]

_____

[3] Given dismissal of the trespass claims by resolution of defendants' first and fourth grounds, the remaining issues raised in grounds 2, 3, 5 and 6 need not be addressed.

### IV.      Discussion

### A.      Gist of the Action

Defendants' first ground for relief is that "Onconome's tort claims (First through Fourth

Claims for Relief) are barred by the gist of the action doctrine."  Motion to Dismiss or for

Summary Judgment, ¶ 1.  The Court agrees that the tort or trespass claims all arise from, are

related to, and are inextricably interwoven with the breach of contract claim, and are therefore

barred under Pennsylvania's gist of the action defense.

### 1.      The Law

The "gist of the action" rule has not been explicitly adopted by the Supreme Court of

Pennsylvania, but it most certainly is a well-established defense to trespass claims in

Pennsylvania.  The rule first surfaced in 1992 in *Bash v. Bell Tel. Co.*, 601 A.2d 825 (Pa. Super.

1992).  As described more recently by the United States Court of Appeals for the Third Circuit:

> Under [Pennsylvania's] "gist of the action" test,
>
> to be construed as a tort action, the [tortious] wrong ascribed to the
> defendant must be the gist of the action with the contract being
> collateral. . . . [T]he important difference between contract and tort
> actions is that the latter lie from the breach of duties imposed as a
> matter of social policy while the former lie for the breach of duties
> imposed by mutual consensus.
>
> *Redevelopment Auth. of Cambria County v. International Ins. Co.*, 454
> Pa.Super. 374, 685 A.2d 581, 590 (1996) (*en banc*) (*quoting Phico Ins. Co. v.
> Presbyterian Med. Servs. Corp.*, 444 Pa.Super. 221, 663 A.2d 753, 757
> (1995)). In other words, a claim should be limited to a contract claim when
> "the parties' obligations are defined by the terms of the contracts, and not by
> the larger social policies embodied in the law of torts." *Bash v. Bell Telephone
> Co.*, 411 Pa.Super. 347, 601 A.2d 825, 830 (1992).

*Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001).

In the context of a claim for fraud, the gist of the action rule was first applied by a

Pennsylvania appellate court in *eToll, Inc. v. Elias/ Savion Advertising, Inc.*, 811 A.2d 10 (Pa. Super. 2002).  As the Pennsylvania Superior Court stated in that case, to date "no Pennsylvania state appellate case has addressed the interplay between fraud and the gist of the action doctrine," 811 A.2d at 15-16, but in predicting that the Supreme Court of Pennsylvania would adopt the doctrine and apply it to fraud claims, the Superior Court analyzed numerous "[f]ederal cases within the Third Circuit [that] have consistently applied the gist of the action test to fraud claims. The separate question of whether the fraud claim was actually barred by the doctrine appears to vary based on the individual circumstances and allegations of the plaintiff. In order to illustrate these principles . . . ," the Superior Court analyzed eleven federal district court decisions from within the Third Circuit dating from 1997 to 2002, applying the gist of the action rule to various fraud claims, and predicted the Supreme Court of Pennsylvania would do the same.[4]

Summarizing the general principles gleaned from those federal cases, the *eToll* case states:

> [P]ersuasive authority interpreting Pennsylvania law has restated the gist of the action doctrine in a number of similar ways. These courts have held that the doctrine bars tort claims: (1) "arising solely from a contract between the parties" [*Galdieri v. Monsanto Co.*, 2002 U.S. Dist. Lexis, 11391 at *33 (E.D. Pa. 2002)]; (2) where "the duties allegedly breached were created and

---

[4] More recent decisions recognizing the gist of the action defense to fraud and other trespass claims in Pennsylvania law include:  *Lombardi v. Allstate Ins. Co.*, 2009 WL 1811540, *8 and n.10  (W.D.Pa. 2009) (Ambrose, J.)); *2401 Walnut, L.P. v. American Express Travel Related Services Co., Inc.*, 2009 WL 398727, *4 (E.D.Pa. 2009) (gist of the action doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims by precluding plaintiffs from recasting ordinary breach of contract claims into tort claims) (quoting *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 229 (3d Cir. 2008) (quoting *eToll Inc. v. Elias/Savion Advertising Inc.*, 811 A.2d 10, 14 (Pa.Super. 2002)); *Tsudis Chocolate Co. v. FGH Consulting USA, Inc.*, 2008 WL 219348, *1 and n.1 (W.D.Pa. 2008) (McVerry, J.), (citing *Williams v. Hilton Group PLC,* 93 Fed. Appx. 384, 385 (3d Cir. 2004).

grounded in the contract itself" [*Werner Kammann Maschenenfabrick GmbH. v. Max Levy Autograph, Inc.*, 2002 WL 126634 at **6-7 (E.D.Pa. 2002)]; (3) where "the liability stems from a contract" [*Asbury Auto. Group LLC. v. Chrysler Ins. Co.*, 2002 WL 15925 at *3 (E.D.Pa. 2002)]; or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." [*Polymer Dynamics, Inc. v. Bayer Corp.*, 2000 WL 1146622 at *6 (E.D.Pa. 2000)].

These courts have not carved out a categorical exception for fraud, and have not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself. Rather, the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.

*eToll*, 811 A.2d at 19-20 (parallel citations omitted).[5]

In the *Bohler-Uddeholm* case, the United States Court of Appeals for the Third Circuit held that plaintiffs' tort claim for breach of fiduciary duty had its genesis in social policy defining the relationship of majority shareholders to minority shareholders, rather than upon the terms of the contract. This tort claim was collateral to the breach of contract claim, and so was not precluded by the gist of the action doctrine. 247 F.3d at 105. The jury was permitted, therefore, to consider the separate breach of fiduciary duty claim. On the other hand, plaintiffs' tort claim for misappropriation of trade secrets and confidential information was defined by agreement and

---

[5] In *eToll*, the appellants alleged that the defendants, an advertising company and its employees, had perpetrated a number of fraudulent schemes in the course of performing their contract with Etoll to market and advertise its product, including deliberately submitting bills containing fictitious charges and unauthorized markups; concealing less expensive ways to accomplish a "market launch" of the product; taking undisclosed kickbacks and commissions; and misrepresenting to Etoll that certain targets had no interest in email products, when in fact interest was high. The Superior Court held that these claims of fraud and misrepresentation were barred by the gist of the action rule because they were "inextricably intertwined with the contract claims." *eToll*, 811 A.2d at 20-21.

interwoven with the breach of contract claim, and to the extent the jury verdict may have reflected an award of damages for misappropriation based upon the breach of terms of the contract, the gist of the action doctrine precluded plaintiffs from pursuing those tort claims.  247 F.3d at 106. To that extent, the Court of Appeals vacated the jury verdict and remanded the case to the district court.

In general, Pennsylvania courts are cautious about permitting tort recovery on contractual breaches.  *Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (1964).  The gist of the action defense forecloses a party's pursuit of a trespass (tort) action for mere breach of contractual duties, in the absence of any separate or independent event giving rise to the tort.  *Air Prods. and Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F.Supp.2d 329, 340 (E.D.Pa. 2003).

The gist of the action defense is not absolute, however, and the simple existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other where such claim is collateral to the contract claim and arises from some social duty rather than the contractual relationship.  *Bohler-Uddeholm*, 247 F.3d at 104.  The *eToll* Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract, but it also observed that fraud "in the inducement of a contract would not necessarily be covered" by the gist-of-the-action doctrine, because "fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself."  *eToll*, 811 A.2d at 17 (quoted in *Air Prods.*, 256 F.Supp.2d at 341.

"[F]raud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists."  *Air Prods.*, 256 F.Supp. 2d at 341 (citing *Foster v. Northwestern Mutual Life*, 2002 WL 31991114, *2-*4

19

(E.D.Pa. 2002).  As Judge Ambrose stated in the *Lombardi* case, a "number of courts, including Pennsylvania appellate courts and district courts in this Circuit, have held that claims of fraud in the inducement, under certain factual situations, were not collateral to the contract claim, and therefore, were not barred by the gist of the action doctrine.  See, e.g., *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa.Super. 2005) (fraud claim was not barred by gist of the action doctrine where plaintiff alleged that the defendant fraudulently and/or negligently agreed to perform obligations that it never intended to perform in order to induce plaintiff to agree to proposed changes in his compensation package and to forego an immediate resignation);  *Air Prods.*, 256 F.Supp.2d at 342  . . ."  *Lombardi*, 2009 WL 1811540 at *8 (additional citations omitted).

While it is true that the gist of the action doctrine will not bar all fraud in the inducement claims, "the particular theory of fraud – whether it lies in inducement or performance – is not dispositive."  *Guy Chemical Co., Inc. v. Romaco N.V.*, 2007 WL 184782, *5-*6 (W.D. Pa. 2007); see also *Owen J. Roberts Sch. Dist. v. HTE, Inc.*, 2003 WL 735098, *2, n. 4 (E.D.Pa. 2003) (applying the gist of the action doctrine to bar a fraud in the inducement claim where the pre-contractual statements regarding ability to supply software in a timely manner were ultimately addressed in the contract);  *Galdieri v. Monsanto Co.*, 245 F.Supp.2d 636, 650 (E.D.Pa. 2002) (dismissing the plaintiff's fraudulent inducement claim under the gist of the action doctrine where the alleged fraud was that the defendant never intended to perform; a "breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform.'") (quoting *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, *5 (D.Del. 2001)).  Rather, the test to be

applied to claims of fraud in the inducement remains the same as that set forth in *eToll*, and the focus of analysis under this doctrine is whether actions lie from a breach of the duties imposed as a matter of social policy or from the breach of duties imposed by mutual consensus pursuant to contract.

### 2.        Application

The Court finds, as a matter of law, that there is no genuine dispute that Onconome's lawsuit is predicated upon its contractual relationships with Pitt and Dr. Getzenberg and that its trespass claims are inextricably interwoven with the breach of contract claim, and are barred therefore by the gist of the action defense.  The Court's finding is based upon the various contracts that have been presented by the parties attached as exhibits to the amended complaints and to the briefs in support and in opposition to summary judgment, and the averments of facts set forth in the Second Amended Complaint and in the Declaration of Ray Cairncross, which averments the Court accepts as true for purposes of deciding the pending Motion to Dismiss or for Summary Judgment.  (See note 2, supra.)

As outlined in the statement of facts set forth above, Onconome bases all of its claims upon the tri-parte contractual relationship between Onconome, Pitt and Dr. Getzenberg and duties imposed by the contracts.[6]  *Whatever* misrepresentations alleged to have been made by Dr. Getzenberg to induce Onconome into entering into a contractual relationship, there is no question that the tri-parte relationship was embodied in a complex series of agreements — CRAs, LAs and Consulting Agreements with Dr. Getzenberg, *each of which contained full integration clauses*.  All of the various Pitt related contracts (the CRAs, the LAs and the Consulting

---

[6] JHU was substituted for Pitt in this tri-parte relationship in 2004.

Agreement) contained not only broad integration clauses, but also express disclaimers.  Brief in

Support of Motion to Dismiss and for Summary Judgment (Doc. No. 32), Ex. 4 and 6, § 13.2;

SAC, Ex. A, §30.

For example, the LA between Pitt and Onconome's predecessor in interest, Tessera

Diagnostics, provides that the parties acknowledge "that this Agreement sets forth the entire

understanding and intentions of the parties hereto as to the subject matter hereof and supersedes

all previous understandings between the parties, written or oral, regrading such subject matters."

Brief in Support of Motion to Dismiss and for Summary Judgment, Ex. 6, § 13.2.  Moreover,

Onconome agreed to the following disclaimer:

> UNIVERSITY DISCLAIMS AND MAKES NO WARRANTIES OF ANY KIND, EITHER
> EXPRESSED OR IMPLIED, AS TO ANY MATTER, INCLUDING BUT NOT LIMITED TO
> WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY,
> PATENTABILITY . . .

Second Amended Complaint, Ex. A, § 14.  Like the PLA, the Pitt CRA and amendments

contained a broad integration clause.  *Id.*, Ex. A, § 30.

Of great significance is that, despite its efforts to characterize itself as a weak victim of

defendants' overbearing and an unknowing captive of defendants' expertise, Onconome and Mr.

Cairncross operated at an extraordinarily high level of sophistication, business savvy and

experience with the scientific-business model that Mr. Cairncross created and nurtured through

the various agreements that he negotiated with Pitt and Dr. Getzenberg.  In *Williams v. Hilton

Group PLC,* 93 Fed. Appx. 384, the United States Court of Appeals for the Third Circuit

affirmed this Court's dismissal of fraud claims involving breach of an exclusive negotiation

agreement under the gist of the action doctrine, despite evidence that the defendant never

intended to honor its promise of exclusivity, because of the arms' length contractual negotiations

and relationships between highly sophisticated sellers and investors, who had embodied their precise undertakings at issue in their final agreement.  See *id*. at 387 ("Williams and Ladbrokes are sophisticated parties who were well able to protect their rights in relation to this matter by contract, and they attempted to do so"); see also *Penn City Investments, Inc. v. Soltech, Inc.*, 2003 WL 22844210, *3 (E.D.Pa. 2003) (quoted as "instructive" in *Williams*, 93 Fed. Appx. at 386) (holding fraudulent inducement claim barred because "pre-contractual statements concerned specific duties that the parties later outlined in the contract").

Onconome tries very hard to coax a distinct "fraud in the inducement" cause of action out of the various pre-contractual relationship misrepresentations attributed to Dr. Getzenberg and, via the agency relationship, to Pitt.  Try as it might, however, Onconome is at the high end on the scale of sophisticated business investors.  Indeed, Mr. Cairncross was the architect of the scientific-business model adopted by the parties, and negotiated the contracts by which the tri-parte contractual relationship would and did operate, which included express disclaimers of warranties and full integration of any claims superseding all other understandings between the parties.  Moreover, plaintiff's conclusory allegations that Dr. Getzenberg never intended to produce a viable and superior biomarker and  immunoassay for prostate cancer based on nuclear matrix proteins when he solicited Onconome for funding are just that - conclusory statements unsupported by specific facts that do not survive the *Twombley* test for pleading intent.  See, e.g. *Bell Atlantic Corp. v. Twombly*, 550 U.S.544 (2007);  *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir.  2008).

Reading all of the terms of the various contracts creating the tri-parte contractual relationship, and examining the operations of the parties as averred by plaintiff, the truth of

which this Court assumes, the Court finds that Onconome's tort claims (its First through Fourth Claims for Relief) all arise from, are related to, and are inextricably intertwined with its breach of contract claim.  As such, these tort claims are barred under Pennsylvania's gist of the action defense, and will therefore be dismissed.

      **B.**      **Statute of Limitations for Trespass Claims**

The parties agree that the Pennsylvania statute of limitations for fraud is two years, but dispute the date on which the statute of limitations began to run.  Defendants argue that Onconome knew or should have known by mid 2006 or at the latest, early 2007, that they had fraud claims against defendants because, by then, the validity of Dr. Getzenberg's cancer biomarker claims had been called into serious question and had, in fact, been tested by plaintiff and others and found to be of dubious validity.  Onconome argues that plaintiff's statute of limitations argument fails because (1) the date of "inquiry notice" raises a disputed issue of fact, (2) defendants ignore the facts showing fraudulent concealment, and (3) defendants' fiduciary duty tolls the statute of limitations.  Plaintiff's Brief in Opposition to Motion to Dismiss or for Summary Judgment (Doc. No. 33), 12.

      **1.**      **The Law**

The statute of limitations in Pennsylvania for actions based on fraud is two years. 42 Pa.C.S.A. § 5524(7) ("Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter."); *Powell v. First Republic Bank*, 274 F.Supp.2d 660, 677 (E.D.Pa. 2003).  A cause of action for fraud accrues, and the

24

two-year limitations period begins to run, when the "plaintiff learns or reasonably should have learned through the exercise of due diligence of the existence of the claim." *Beauty Time, Inc. v. Vu Skins Sys., Inc.*, 118 F.3d 140, 148 (3d Cir. 1997) (applying Pennsylvania law). This so called "discovery rule" arises "from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause." *Pocono Int'l. Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983) (emphasis in original) (cited by *Beauty Time*, 118 F.3d at 143-44).

"The question of whether a plaintiff has exercised due diligence in discovering his own injury is usually a question for the jury, see e.g., *DeMartino v. Albert Einstein Medical Center, Northern Div.*, 313 Pa.Super. 492, 460 A.2d 295 (Pa.Super.1983), but when it appears that no factual question has been presented, the court may conclude that the statute of limitations operates as a bar to the claim." *State Farm Mut. Auto. Ins. Co. v. Midtown Medical Center Inc.*, 2005 WL 627969, *4 (E.D.Pa. 2005) (quoting *Noyes v. General Am. Life Ins. Co.*, 1998 WL 54347 (E.D.Pa. 1998)); see also *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123, 471 A.2d 493, 502 (Pa.Super. 1984) (overturned on other grounds).

All that is required to trigger the running of the statute of limitations is sufficient information to "awaken inquiry and direct diligence in the channel in which it would be successful." *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir. 1991) (quoting *Deemer v. Weaver*, 324 Pa. 85, 90, 187 A. 215 (1936)).  Indeed, "a claimant need only be put on inquiry notice by 'storm warnings' of possible fraud." *Ciccarelli v. Gichner Systems Group, Inc.*, 862 F.Supp. 1293, 1301 (M.D.Pa. 1994) (citing *In re Asbestos School Litigation*, 1991 WL 175848 at *3 (E.D.Pa. 1991)).

The doctrines of equitable tolling and fraudulent concealment provide that "[w]hen an injured party is lulled into a sense of false security or misled," the "culpable party will be

estopped from advocating a statute of limitations." *Petri v. Smith*, 307 Pa. Super. 261, 269

(1982). *Bohus*, 950 F.2d at 925. "Even unintentional concealment" tolls the statute until the

plaintiff "knew or reasonably should know of his injury and its cause." *Checcio v. Rice*, 582 Pa.

253, 268-72 (2005) (holding summary judgment precluded - "when a party's injury and its cause

were discovered or discoverable is for the jury"). Where a plaintiff is on notice of "storm

warnings," the statute still does not begin to run if plaintiffs "exercised reasonable due diligence

and yet were unable to discover their injuries." *Mathews v. Kidder, Peabody & Co., Inc.*, 260

F.3d 239, 252 (3d Cir. 2001). Under Pennsylvania law, assertion of fraud or concealment for

purposes of tolling statute of limitations must be proved by clear, precise and convincing

evidence. *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274 (3d Cir. 1991).

### 2.   Application

Defendants argue that the two year statute of limitations for fraud began to run "in early

2008 when, with reasonable diligence and over defendants' concealment, plaintiff came to

believe defendants had misrepresented their research. Onconome filed its original complaint in

this Court on September 2, 2009. With a two-year fraud statute and adding 127 days for tolling

pursuant to a tolling agreement (Def. Br. at 6)[7] defendants cannot prevail here unless they can

show as a matter of law that the statute began to run prior to April 28, 2007." Plaintiff's Brief in

Opposition to Motion to Dismiss or for Summary Judgment (Doc. No. 33), 11, n.16. The Court

---

[7] The Tolling Agreement, drafted at Onconome's request, covered all claims Onconome may have "against the University." Brief in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 32), Ex. 14, October 2008 Tolling Agreement. Dr. Getzenberg was not a party to the Tolling Agreement. The Tolling Agreement continued in effect "until 7 days after written notice of termination . . ." (Ex. 14, ¶ 2.) The University provided a termination notice on February 17, 2009, and so the Tolling Agreement expired February 24, 2009. (Ex. 15, February 17, 2009 letter.) Onconome commenced this action on September 2, 2009.

finds, as a matter of law, that from Onconome's own representations of fact, reasonable persons could not disagree that Onconome knew or should have known about defendants' alleged fraud by October, 2006, when the "storm warnings" were loud and strong, and thus plaintiff's fraud claims are untimely.

Onconome itself made the following representations.  By early 2006, Onconome hired its own in-house scientists.  Second Amended Complaint, ¶185; Defendants' Brief  in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 32), Ex. 12, Maryland Action Amended Complaint ("MAC") ¶155 (wherein Onconome included the words "by early 2006" when describing hiring its in-house scientists).  In the second half of 2006, Onconome's in-house scientists repeatedly tried to replicate Dr. Getzenberg's research results, but failed "*without exception*."  Compare Second Amended Complaint, ¶186 to Defendants' Brief in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 32), Ex. 12, MAC ¶ 156, where Onconome included the words "in the second half of 2006," which it omitted in its Second Amended Complaint.  By October, 2006, therefore, Onconome knew that Dr. Getzenberg's claims to have developed superior biomarkers for prostate cancer, EPCA and EPCA-2, and for other cancers, was, at the very least, highly suspect, and could not be replicated.

Moreover, Onconome learned of troubling practices in Dr. Getzenberg's lab when one of Dr. Getzenberg's principle assistants, Dr. Eddy Leman, visited Onconome in October 2006, and was unable to successfully run Dr. Getzenberg's immunoassays in Onconome's lab.  Questioned about this, Dr. Leman disclosed that Dr. Getzenberg's lab often discarded assay results when they did not perform as expected.  He also explained that Dr. Getzenberg's lab did not regularly use controls when it ran assays.  Defendants' Brief in Support of Motion to Dismiss or for Summary

Judgment, Ex. 13, June 27, 2009 Spencer Hall letter, p. 9.  Onconome asserts that in October

2006, Dr. Leman "confessed that Dr. Getzenberg had obtained his reported results by

disregarding unfavorable results and failing to use proper protocols."  Defendants' Brief in

Support of Motion to Dismiss or for Summary Judgment, Ex. 13, at 2 and 9; Second Amended

Complaint, ¶ 187.

     In a highly competitive business such as cancer research, in light of the steps Onconome

had taken without success to replicate Dr. Getzenberg's claimed results, the "confession" by Dr.

Leman in October 2006, and considering the level of sophistication and savvy of Onconome's

CEO, Mr. Cairncross, the Court finds, as a matter of law, that Onconome knew or should have

known no later than October 2006  that Dr. Getzenberg's results were invalid.  See *In re TMI*, 89

F.3d 1106 (3d Cir. 1996), cert. denied 519 U.S. 1077 (1997) (under Pennsylvania law, plaintiffs

who sought to recover for injuries allegedly sustained as result of Three Mile Island nuclear

accident could not rely on doctrine of fraudulent concealment to extend statute of limitations on

actions; even though plaintiffs pointed to statements by workers of utility downplaying

seriousness of accident immediately after it occurred, voluminous information about accident

was in public domain).  Moreover, plaintiff has not pointed to clear, precise and convincing

evidence of fraudulent concealment that would justify tolling the statute of limitations, especially

in light of Dr. Leman's "confession" in October 2006.

     The Court also rejects plaintiff's claim that defendants should be estopped from asserting

the statute of limitations because Dr. Getzenberg and Pitt breached fiduciary obligations to

plaintiff.  The Supreme Court of Pennsylvania has held that a confidential relationship exists "as

a matter of fact whenever one party has reposed a special confidence in another to the extent that

the parties do not deal with each other on equal terms, either because of an overmastering prominence on one side, or weakness, dependence or justifiable trust, on the other." *In re Estate of Clark*, 467 Pa. 628, 359 A.2d 777, 781 (1976).  Such a relationship exists whenever the law recognizes that "a party is bound to act for the benefit of another, and can take no advantage to himself." *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412, 416-17 (1980).  Thus, "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed" the basis for an unfair advantage is created. *Id*.

Contractual relationships, even franchise agreements, do not ordinarily give rise to confidential or fiduciary relationships between the parties.  *Cottman Transmission Systems, LLC v. Kershner*, 536 F.Supp.2d 543, 556 (E.D.Pa. 2008) (citations omitted).  A confidential or fiduciary relationship does not exist merely because one party relies on and pays for the specialized skill or expertise of the other party.  *eToll*, 811 A.2d at 23.  The critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by "overmastering influence" on one side or "weakness, dependence, or trust, justifiably reposed" on the other side.   *Id*. A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.  *Id.*

Defendants were independent contractors, and the CRAs disclaimed any joint venture or agency relationship.  Second Amended Complaint,  Ex. A, §§ 9 and 10.  The record simply cannot support an inference of "overmastering influence" on one side or "weakness, dependence, or trust, justifiably reposed" on the other side.

29

Onconome and defendants certainly performed different roles in their tri-parte contractual relationships, but it is obvious from the record that Onconome and its CEO are not inferior players in the scientific-business model crafted by Mr. Cairncross, that Onconome had the ability to and did, in fact, seek advice from outside scientists, and that Onconome was not taken advantage of by defendants' overwhelming influence.  There was no lopsided or inequitable distribution of power in their relationship that would sustain a finding that defendants were in a fiduciary relationship to Onconome.

For all of the foregoing reasons, the Court finds Onconome's fraud related claims to be untimely under Pennsylvania's two year statute of limitations for trespass actions, including those alleging fraud and deceit.

### C.     Breach of Contract

Defendants do not vigorously press their argument that Onconome's Second Amended Complaint fails to state a claim for breach of contract, and it would be rather incongruous for this Court to conclude that the tort claims were merely plaintiff's attempt to recast a breach of contract claim as various fraud related tort claims while holding that plaintiff did not state a breach of contract claim.  The Court finds that Onconome's Second Amended Complaint states a claim for breach of contract (made only against Pitt), and will deny defendants' Motion to Dismiss or for Summary Judgment on the fifth cause of action for breach of contract.

**IV.**     **Conclusion**

For the above stated reasons, this Court will enter an order granting in part and denying in part defendants' Motion to Dismiss Second Amended Complaint or in the Alternative, Motion for Summary Judgment (Doc. No. 31).


<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc:     All Registered ECF Counsel and Parties